FRANCISCO y MIGUEL BALLESTER, como socios haciendo negocios bajo la razón social de BALLESTER HERMANOS, demandante y apelada *v.* CARSTENS PACKING Co., demandada y apelante.

No. 5577.—*Sometido:* Noviembre 25, 1931. *Resuelto:* Julio 22, 1932.

878

*Hartzell, Kelley & Hartzell* y *F. Ramírez de Arellano,* abogados de la apelante; *Molina, Dubón & Ochoteco,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR HUTCHINSON emitió la opinión del tribunal.

La demandante, que en lo sucesivo se le designará con el nombre de Ballester, obtuvo sentencia contra la demandada, que en lo sucesivo se le designará como Carstens, por daños y perjuicios provenientes de un incumplimiento de contrato. La cuestión principal es cuál fué el contrato entre las partes, o, más específicamente, si hubo una novación o modificación del pacto original.

El contrato original se refería a la compra de cierta can-

tidad de manteca que debía ser despachada en tres embar-
ques: uno durante la primera quincena de septiembre, el
otro durante la última quincena de septiembre y el tercero
durante la primera quincena de octubre. En octubre 4 Ba-
llester cablegrafió a Carstens solicitando le explicara un ca-
blegrama recibido de Carstens y preguntándole la fecha de
salida de Tacoma del embarque correspondiente a la última
quincena de septiembre, de haberlo hecho. En octubre 5
Carstens contestó: ''Second lot shipped steamer Chas. Mc-
Cormick September twenty-eighth steamer now in dry dock
Seattle will arrive San Juan about November fourth sailing
from Seattle about October fifteenth if buyers going to refuse
lard account of delay in shipping we must know immediately
so can divert shipments regret this occurrence.'' En octu-
bre 8 Ballester cablegrafió a Carstens pidiéndole que divir-
tiera mil cajas y que no hiciera futuros embarques. Siguen
otros cablegramas en orden cronológico. Octubre 11, de
Carstens a Ballester: ''Charles McCormick sailing thirteenth
have unloaded thousand cases shall we ship six hundred two
thirty-sevens three hundred one fifties on this steamer which
is second half September shipment your order September
seventh stop shall we ship first half October same order nine
hundred cases this steamer Answer quick.'' Octubre 11, de
Ballester a Carstens: ''Understand McCormick bringing one
thousand 2/37 ship same steamer Mayagüez total nine hun-
dred lithographed 1/50 thirteen dollars exactly alike samples
received stop Telegraph sailing date next steamer.'' Octubre
15, de Ballester a Carstens: ''Very disappointed. Why do
you not reply?'' Octubre 16, de Carstens a Ballester: ''Ship-
ped thousand cases two thirty-seven nine hundred cases one
fifty stop next steamer due leave Tacoma October twenty-
fifth.'' Noviembre 13, de Ballester a Carstens: ''Surprised
McCormick arrived without shipments on this ground buyers
have cancelled stop Bank advises documents indicate goods
coming steamer Hauptman which sailed beyond contract

time." Noviembre 16, de Carstens a Ballester: "Hauptman was first steamer to load at Tacoma we did best possible therefore expect you accept shipment." Noviembre 18, de Ballester a Carstens: "Very sorry but buyers reject shipments your cables October fifth eleventh specified McCormick which was schedule second half September Tacoma Hauptman never mentioned otherwise we had stopped shipments."

Carstens adujo por vía de defensa que había obtenido cabida para 2,900 cajas de manteca en el vapor Charles McCormick que se esperaba partiera de Tacoma el 13 de octubre; que este vapor se hallaba en los astilleros de Seattle y debía llegar a San Juan alrededor del 4 de noviembre; que Carstens entonces cablegrafió indagando si Ballester se negaría a aceptar la manteca debido a la demora sufrida en el embarque y que Ballester entonces rehusó la orden; que Carstens inmediatamente redujo la reserva de cabida para las 2,900 cajas a una reserva para 1,900 cajas y como resultado de esta rebaja fué virtualmente imposible al vapor Charles McCormick tocar en Tacoma; que a fin de evitar demora innecesaria el embarque se hizo por el vapor Hauptman que entonces estaba tomando carga en Tacoma y que estaba señalado para salir alrededor de la misma fecha que el McCormick, y salió para Puerto Rico el 13 de octubre; que los vapores Hauptman y McCormick llegaron a San Juan durante el mes de noviembre con sólo una diferencia de seis días entre las fechas de sus respectivas llegadas; que como el vapor McCormick se hallaba en los astilleros, tanto la compañía de vapores como Carstens estuvieron bajo la impresión de que el vapor Hauptman sería el primero en llegar a Puerto Rico y que ésta fué la causa por la cual Carstens no cablegrafió a Ballester en relación con el cambio del barco en que se hizo el embarque.

Realmente la única prueba para sostener estas alegaciones fué la información contenida en los cablegramas introducidos por la demandante. Una prueba amplia difícilmente

podría haber afectado el resultado. Sin embargo, los hechos alegados en la contestación arrojan de soslayo una corriente de luz interesante sobre los cablegramas. Podría admitirse que Carstens, después de saber que el vapor McCormick no tocaría en Tacoma, trató de buena fe de dar cumplimiento al contrato en cuanto en aquel entonces le era posible. No obstante, Carstens no había informado a Ballester ni le comunicó entonces que se había reservado cabida en el vapor McCormick para 2,900 cajas, ni que la cabida así reservada había sido reducida a cabida para 1,900 cajas, ni que con motivo de un cambio en el itinerario del vapor McCormick el despacho se haría por el vapor Hauptman. A Ballester se le había dado la seguridad de que Carstens había despachado el segundo embarque de manteca en septiembre 28 por el vapor Charles McCormick, que había tenido que ir a los astilleros de Seattle pero que saldría de Seattle en octubre 15 y que debía llegar a San Juan alrededor del 4 de noviembre. Esto fué seguido por la aseveración de que Carstens había desembarcado mil cajas y que el McCormick saldría en octubre 13. Esta aseveración estuvo unida a la indagación de si Carstens debía hacer un embarque adicional por el mismo vapor y a la súplica de que se contestara en seguida. Ballester inmediatamente cablegrafió su impresión de que el McCormick traía determinado embarque y dió órdenes adicionales para el transporte y entrega por el mismo vapor en Mayagüez. Este cablegrama permaneció sin contestar por espacio de cuatro días. Ballester entonces expresó su desagrado y pidió que se le diera una explicación por la demora habida en la contestación. Ni aun entonces Carstens dió la explicación solicitada, ni corrigió la falsa impresión provocada en Ballester, sino que se conformó con decir que se habían despachado 1,900 cajas. Ballester, que había aceptado este embarque, que Carstens manifestó haber sido hecho en septiembre 28 por vapor McCormick, tenía fundados motivos para creer que la manteca estaría disponible para ser entregada a

sus parroquianos a la llegada del vapor McCormick a San Juan. La infructuosa tentativa de embarcar por otro vapor y entregar la manteca en San Juan a la llegada del vapor McCormick o antes no fué ni el cumplimiento de un contrato para tal entrega ni una excusa suficiente por su incumplimiento.

La fecha de embarque era un factor importante del contrato original. Ese contrato fué modificado al aceptar Ballester un embarque que se decía haber sido efectuado en septiembre 28 por un vapor cuya salida había sido demorada por haber tenido que ser enviado a los astilleros. Por consiguiente, el elemento tiempo del contrato varió de la fecha de embarque mencionada en el contrato original a la fecha de la llegada del vapor McCormick a San Juan. La nueva obligación asumida por Carstens era entregar la manteca en San Juan a la llegada del vapor McCormick o antes, en caso de no hacerse el embarque por dicho vapor McCormick. De estar envuelta entonces alguna fecha de partida, era la fecha de partida del vapor McCormick. El tiempo formaba todavía parte de la esencia del contrato pero el factor importante lo era ahora la fecha de entrega en San Juan que debía ser determinada por la fecha de llegada del McCormick. La fecha de cumplimiento, si se trataba de hacer el despacho por cualquier otro vapor, era la del arribo del McCormick a San Juan, y no la fecha de partida ni la fecha de llegada del vapor. El nuevo contrato, o el contrato original tal cual quedó modificado, de no ser un contrato para la entrega por el vapor McCormick a su llegada a San Juan, era por lo menos un contrato para entrega en San Juan a la llegada de dicho vapor o antes. El dejar de entregar en dicha fecha o antes por el vapor McCormick o por cualquier otro vapor, fué un incumplimiento del contrato.

Si la corte de distrito cometió error, según alega la apelante, al sostener que el contrato era para embarque por el Charles McCormick en octubre 13, el error fué inofensivo.

La corte no erró, según insiste también la apelante, al sostener que la demandada dejó de cumplir su contrato al embarcar la manteca por el vapor Hauptman que zarpó cinco o seis días después que el McCormick.

■■ Otra contención es que la corte de distrito erró al dictar sentencia en favor de la demandante sin que hubiera prueba de los daños y perjuicios o de la cuantía de los mismos. Francisco Ballester, teniendo ciertos documentos en sus manos, declaró que la mercantil había vendido toda la manteca en cuestión con una ganancia antes de la llegada del McCormick y que los daños y perjuicios ascendían a $769.01. No fué repreguntado pero más tarde declaró como testigo de la demandada que se negó a aceptar la manteca a la llegada del vapor Hauptman debido a que sus parroquianos se habían negado a aceptar la entrega posterior hecha por ellos; que la baja en precio no le afectó porque él había comprado y vendido; y que no hubiera sido él sino las personas que de él adquirieron quienes se habrían perjudicado con la baja o beneficiado con un alza en el mercado. La credibilidad de este testigo era cuestión a resolver por el juez sentenciador, que aceptó su declaración como cierta. No podemos convenir con el criterio de que la corroboración con la presentación de los contratos que el testigo manifestó tener en su poder en aquel entonces, o llamándose a los parroquianos mencionados por él, era necesaria a fin de presentar un caso prima facie. El haber perdido los beneficios de las ventas ya efectuadas para entrega a la llegada del vapor Charles McCormick fué una medida adecuada de daños y perjuicios. Véase el artículo 1059 del Código Civil (Revisión de 1930); *Fernández* v. *Ortiz,* 33 D.P.R. 6; *Barr* v. *Henderson,* 105 La. 691, 30 So. 158.

De existir el error atribuído a la corte inferior por manifestar en su relación del caso y opinión que las negativas contenidas en la contestación no eran específicas y al no prestar debida atención a cierta evidencia tendente a demostrar que

el Charles McCormick hubo que enviarlo a los astilleros debido a tener el timón roto, dicho error no daría lugar a la revocación.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Señor Córdova Dávila no intervino.